Filed 8/21/23  Marriage of Prunchunas CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of EDWARD and ELBA PRUNCHUNAS. | B319493, B321105 (Los Angeles County Super. Ct. No. 18 STFL12634) |
| EDWARD PRUNCHUNAS, Respondent, v. ELBA PRUNCHUNAS, Appellant. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Christine W. Byrd, Judge.  Affirmed.

Bickford Blado & Botros and Andrew J. Botros for Appellant.

Law Offices of James L. Keane, James L. Keane and Joy Dracup Stanley for Respondent.

_____

Elba Prunchunas (Elba)[1] appeals from separate judgments entered in a bifurcated marriage dissolution proceeding with Edward Prunchunas (Edward).  From the judgment entered on February 2, 2022, Elba appeals a permanent spousal support award in her favor of $5,000 per month, to be reduced to zero upon Edward's retirement, and the denial of her request for $693,977 in retroactive temporary spousal support for the period from September or October of 2018 to February 1, 2020.  (B319493.)  From the judgment entered on May 23, 2022, Elba challenges a $100,000 attorney fees award against her as sanctions under Family Code section 271.[2]  (B321105.)  We affirm both judgments.

## BACKGROUND

**The dissolution judgment**

Elba and Edward were married on February 26, 1977, and separated on September 30, 2018.  They have one adult daughter.  Edward petitioned for dissolution of the marriage in October 2018.  A judgment dissolving the marriage was entered on January 30, 2020, with the family court reserving jurisdiction over the remaining issues concerning division of property and spousal support.

_____

[1] For clarity, we refer to the parties by their first names.

[2] All further statutory references are to the Family Code.

2

**Temporary support order**

On December 11, 2019, Elba filed a request for temporary support and for attorney fees and costs. At a July 6, 2020 hearing, the family court ordered Edward to pay Elba $150,000 in attorney fees, costs, and forensic accounting fees. On October 9, 2020, the family court issued an order awarding Elba temporary spousal support of $22,587 per month, commencing on February 1, 2020. The court denied without prejudice Elba's request for temporary spousal support prior to February 1, 2020, as Elba had not included that request in her moving papers. Neither party appealed the October 9, 2020 order.

**Trial, statement of decision, and judgment**

The matter proceeded to a trial on issues concerning division of property and permanent spousal support. The parties filed a joint stipulation of undisputed facts stipulating, among other things, that Elba is 76 years old and has not worked outside the marriage since March 1989; that Edward is 71 years old and the Chief Financial Officer of Cedars-Sinai Medical Center where he continues to work past his retirement age of 65. The parties further stipulated that Edward's forensic accountant determined the marital standard of living to be $39,157 per month each, and Elba's forensic accountant determined the marital standard of living to be $45,492 per month each. Both accountants included savings and investments in their respective determinations.

Edward, Elba, and their respective forensic accountants testified at a three-day trial. In November 2021, the trial court issued a tentative proposed statement of decision, to which Elba objected. On December 2, 2021, the trial court filed a final Statement of Decision After Trial on Reserved Issues, stating it

had modified its decision to address certain objections and overruled other objections.

**Temporary spousal support**

The trial court denied Elba's request for $693,977 in retroactive temporary spousal support, noting that it was unclear whether the court had the authority to do so. The trial court went on to state: "Even if it could, however, doing so would not meet the purpose of temporary spousal support. The purpose of temporary spousal support is to allow the supported spouse to continue to live in his or her accustomed manner while litigating the dissolution." The trial court found that after the parties separated, Elba had unrestricted access to more than $2 million in community funds and her expenditures at that time totaled $337,000—half the amount she was seeking in retroactive temporary spousal support. The court found nothing to indicate that Elba had curtailed her lifestyle during that period, and "[t]he only conclusion is that she continued to live in her accustomed manner and that additional funds were not necessary to maintain that lifestyle." The trial court rejected Elba's argument that additional temporary support funds were needed for investment and savings as part of the marital standard of living: "While it is true that the parties had a pattern of saving during the marriage (and now have a substantial community estate for division), the retroactive temporary spousal support that [Elba] is requesting now would serve only to increase her separate property investment portfolio at the expense of [Edward's] separate property earnings. That is not the purpose of temporary spousal support."

4

**Permanent spousal support**

As to permanent spousal support, the trial court acknowledged that the parties' respective forensic accountants determined the marital standard of living to be $39,000 to $46,000 per month. The trial court then summarized its consideration of the factors specified in section 4320. As relevant here, the court determined Elba's expected monthly income to be between $17,000 and $21,000, consisting of $1,614 in monthly Social Security retirement benefits, a $573 monthly pension from her prior employment, $7,366 in payments from community retirement plans, and $8,000 to $12,000 in income from $2 to $3 million in cash (her share of the community liquid assets). The trial court determined Elba's monthly expenses to be approximately $22,000, not including amounts for savings and investments.

The court found that Edward, although eligible for retirement, continued to work and earned approximately $192,000 per month. That income would cease upon Edward's retirement, when his monthly income would be reduced to between $19,000 to $23,000, consisting of $3,839 per month in Social Security benefits, his share of the community retirement funds, and $8,000 to $12,000 in income from his share of liquid community assets. The trial court noted that Edward, while employed, had significant income and the ability to pay spousal support. Upon his retirement, however, Edward's ability to pay would be substantially reduced and would depend principally on income from his share of the community retirement plans and community assets. The court noted that Edward was 71 and Elba was 76.

5

The trial court concluded: "Having considered all the evidence presented, including credibility, the marital standard of living, and the factors identified under Fam. Code §4320 and §4336, and in the exercise of its discretion, the Court finds and orders that spousal support be in the amount of $5,000 per month as of November 1, 2021, payable on the 1st day of each month, and the amount shall automatically be reduced to $0 per month effective on the 1st day of the month following the month of [Edward's] retirement." The trial court retained jurisdiction over the issue of spousal support. Judgment was entered on February 2, 2022.

**Section 271 sanctions**

On January 28, 2022, Edward filed a motion under section 271 seeking $328,000 in attorney fees as sanctions against Elba. In his motion, Edward argued that Elba's conduct frustrated his efforts to settle. Edward's motion was supported by settlement offers he had extended to Elba and communications between the parties regarding those offers. Elba opposed the attorney fees motion. The parties agreed to submit the issue to the trial court on their respective briefs.

The trial court issued a tentative decision and proposed statement of decision on February 22, 2022, awarding $100,000 in sanctions against Elba. The court reasoned that sanctions were warranted given Elba's refusal to accept three "highly favorable" settlement offers Edward had extended over the course of 15 months. Elba submitted objections to the proposed statement of decision and asked the trial court to state its facts and reasoning as to why the court considered Edward's settlement offers to be "highly favorable." The court denied

6

Elba's request and on May 23, 2022, entered judgment on the section 271 sanctions.

In the judgment, the trial court noted that after the July 6, 2020 hearing at which Elba was awarded her attorney fees, her "conduct was contrary to the policy behind Section 271 to promote settlement of litigation and to cooperate to reduce the cost of litigation." The court then stated the facts on which it based the sanctions award: "During the next 15 months, until trial in November 2021, [Edward] extended 3 highly favorable settlement offers to [Elba] — on 10/30/2020, 4/20/2021, and 6/8/2021 — and yet she refused to reach a settlement. Even after the trial in November 2021, [Edward] offered to resolve the bifurcated issue with each party paying his or her own fees, and [Elba] refused. During the time period after the hearing of July 6, 2020, [Edward] incurred over $356,000 in attorney's fees and costs, of which $208,000 was preparation for and conduct of the trial in November 2021. Had [Elba] accepted any of the settlement proposal[s], the need for trial would have been eliminated. By refusing all settlement proposals, [Elba] caused [Edward's] fees to increase exorbitantly and, especially, forced the expense of taking the case to trial. Given the fact that [Elba] had engaged two different counsel during this time period and yet neither were able to reach a settlement, it must be concluded that the problem was [Elba] herself. Under the circumstances, sanctions are appropriate."

The trial court found sanctions in the amount of $208,000—fees Edward incurred in preparing for trial and trying the case—were appropriate. The court further found that sanctions in that amount would impose an unreasonable financial burden on Elba

7

and reduced the amount to $100,000, payable in two installments of $50,000.

## DISCUSSION

Elba contends the trial court erred by ordering permanent spousal support in an amount below the marital standard of living as determined by the parties' respective forensic accountants; by failing to account for the parties' history of savings and investment; and by reducing support payments to zero upon Edward's retirement. Elba further contends the trial court erred by denying her request for retroactive temporary spousal support and by ordering $100,000 in sanctions against her under section 271.

## I. Permanent Spousal Support

### A. Applicable law and standard of review

Section 4330, subdivision (a) authorizes the court in a marriage dissolution or separation proceeding to order one party to pay for the support of the other, based on the marital standard of living: "In a judgment of dissolution of marriage or legal separation of the parties, the court may order a party to pay for the support of the other party an amount, for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in Chapter 2 (commencing with Section 4320)." (§ 4330, subd. (a).)

Section 4320 sets forth the factors the court must consider in ordering spousal support.[3] These include, among other factors, the marital standard of living.

---

[3] Section 4320 states: "In ordering spousal support under this part, the court shall consider all of the following

8

circumstances:  [¶] (a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:  [¶] (1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment. [¶] (2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties. [¶] (b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party. [¶] (c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living. [¶] (d) The needs of each party based on the standard of living established during the marriage. [¶] (e) The obligations and assets, including the separate property, of each party. [¶] (f) The duration of the marriage. [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party. [¶] (h) The age and health of the parties. [¶] (i) All documented evidence of any history of domestic violence, as defined in Section 6211, between the parties or perpetrated by either party against either party's child, including, but not limited to, consideration of: [¶] (1) A plea of nolo contendere. [¶] (2) Emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party. [¶] (3) Any history of violence against the supporting party by the supported party. [¶] (4) Issuance of a protective order after a hearing pursuant to Section 6340. [¶] (5) A finding by a court during the pendency of a divorce, separation,

9

After considering the factors set forth in section 4320, a trial court has broad discretion in setting the amount and duration of a spousal support award.  " 'In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it. . . .  In awarding spousal support, the court must consider the mandatory guidelines of section 4320. Once the court does so, the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.]  "Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders." ' " (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.)  An abuse of discretion occurs only " 'when it can be said that no judge reasonably could have made the same order.' " (*In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 161.)

### B.  Marital standard of living

Elba's principal challenge to the permanent support order is based on an incorrect premise—that the trial court was

---

or child custody proceeding, or other proceeding under Division 10 (commencing with Section 6200), that the spouse has committed domestic violence. [¶] (j) The immediate and specific tax consequences to each party. [¶] (k) The balance of the hardships to each party. [¶] (*l*) The goal that the supported party shall be self-supporting within a reasonable period of time. . . . [¶] (m) The criminal conviction of an abusive spouse . . . .[¶] (n) Any other factors the court determines are just and equitable."

required to award spousal support in an amount at least equal to the marital standard of living, which the parties' respective accountants determined to be $39,000 to $46,000 per month. The marital standard of living is not a " 'mathematical standard,' " however, but rather " 'a general description of the station in life the parties had achieved by the date of separation.' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 424 (*Grimes*), quoting *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 (*Smith*).) "Section 4330 does not make 'marital standard of living' the absolute measure of reasonable need. 'Marital standard of living' is merely a threshold or reference point against which all of the statutory factors may be weighed. [Citation.] It is neither a floor nor a ceiling for a spousal support award." (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1560.)

"While 'the marital standard of living is an important factor in determining spousal support, it is not the only factor, and its importance in determining whether it is "just and reasonable" (§ 4330) to award spousal support will vary based on the court's evaluation of the section 4320 factors.' (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1247.) After considering the marital standard of living along with the other statutory factors, 'the court may "fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case." ' (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1316.)" (*Grimes, supra,* 45 Cal.App.5th at p. 425.)

11

The record shows that the trial court considered the parties' marital standard of living as determined by their respective forensic accountants, which included savings and investments during the marriage. Against that standard, the trial court weighed other relevant statutory factors set forth in section 4320, as well as the facts and equities of the parties' circumstances. These included the parties' respective ages, Edward's current eligibility for retirement, Edward's ability to pay support during his continued employment and after retirement, and the relative parity in the parties' respective monthly incomes after Edward's retirement. The trial court found that while Edward is currently a high-earning executive, upon retiring, his income stream would cease, and his ability to pay support would depend on community retirement plans. The trial court's consideration of the section 4320 factors was within the bounds of reason, and we will not reweigh those factors. (See *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304 (*Cheriton*) [trial court has discretion to determine appropriate weight to accord each factor].)

We reject Elba's contention that the trial court's failure to include the parties' history of saving and investment during the marriage as an element of the support award requires reversal of the judgment. The trial court was obliged to consider the marital history of saving as part of the parties' marital standard of living (*In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1098 (*Drapeau*)), and the record shows that it did so. The trial court was not required, however, to set support at an amount that would include such savings. As one authority has noted: "[T]he trial court should consider the parties' practice of saving income as an element of the marital standard of living; and, after

12

considering and weighing all of the applicable § 4320 factors, it may be appropriate to award spousal support in an amount sufficient to continue to save as they did during the marriage. . . . [¶] This does not mean, of course, that a supported spouse is necessarily 'entitled' to support at a level that will allow for savings at a particular rate." (Hogoboom et al., Cal. Practice Guide: Family Law (The Rutter Group 2023 update) ¶¶ 6:951.2, 6:951.3.)

*Drapeau, supra,* 93 Cal.App.4th 1086, does not support Elba's position that marital savings must be included as part of a support order, so long as the supporting party can afford to pay. The court in *Drapeau* reversed a spousal support order and remanded the matter to the trial court because there was "no policy reason to foreclose consideration of savings as an aspect of MSL" and it was "not clear from the record whether the trial court considered the marital history of savings as an element of the parties' MSL." (*Id.* at pp. 1097, 1098.) Here, in contrast, the record shows that the trial court considered the parties' pattern of saving during the marriage as a component of the marital standard of living, weighed it against the other factors set forth in section 4320, and declined to include savings as part of the support award.

California law does not support Elba's argument that because Edward can presently afford to pay permanent spousal support in an amount that would allow Elba to enjoy her predissolution marital standard of living (including savings), the trial court abused its discretion by not ordering him to do so. (See *Grimes, supra,* 5 Cal.App.5th at p. 425; *Smith, supra,* 225 Cal.App.3d at p. 483.)

13

The record discloses no abuse of discretion by the trial court in setting the amount of the permanent support order.

### C. Step-down in support upon Edward's retirement

The trial court did not abuse its discretion by ordering Edward's support obligation to be reduced to $0 upon his retirement.  Step-down provisions in support orders may be appropriately employed in some situations, consistent with the exercise of the trial court's broad discretion.  (*Cheriton, supra,* 92 Cal.App.4th at p. 309.)  " '[O]rders for changes in support to take effect in the future must be based upon reasonable inferences to be drawn from the evidence, not mere hopes or speculative expectations.' " (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 740.)  "The critical inquiry . . . is whether the step-down provision, standing alone, is supportable given the parties' circumstances at the time the order was made." (*Cheriton,* at p. 311.)

The step-down provision at issue here is supported by the evidence, by reasonable inferences that can be drawn therefrom, and by the parties' circumstances at the time the support order was made.  Edward was 71 years old when the support order was made.  Although he continued to be employed, he was eligible for retirement and had been eligible since age 65.  Given Edward's age and the duration of his employment, the trial court could reasonably infer he might retire in the not too distant future.  The trial court found that Edward's earning capacity was dependent upon his continued employment, and that upon retirement, his income, and his ability to pay spousal support would be substantially reduced to between $19,000 and $23,000 per month.  The trial court found that Elba, age 76, would have monthly income between $17,000 and $21,000 after division of

14

the community estate, an amount roughly equal to her projected monthly expenses. The trial court considered these factors and found a step-down in support upon Edward's retirement to be appropriate.

The step-down provision is supported by the parties' circumstances at the time the order was made. These circumstances include the parties' respective ages, Edward's current age and eligibility for retirement, and the relative parity in the parties' monthly income after Edward's retirement. The record does not support Elba's argument that the step-down order was speculative.

*In re Marriage of Richmond* (1980) 105 Cal.App.3d 352, on which Elba relies, undermines rather than supports her position. The appellate court in that case upheld as a proper exercise of the trial court's discretion a step-down provision terminating spousal support on a specified date, unless the supported spouse made a showing of good cause to extend spousal support beyond that date. (*Id.* at pp. 355–356.) The trial court here set no specific date on which Edward's support obligation would terminate but made that obligation dependent upon Edward's continued employment.

Elba fails to establish any abuse of discretion by the trial court in issuing the permanent support order.

## II. Temporary Spousal Support

The trial court lacked jurisdiction to grant Elba's request for retroactive temporary spousal support, and her challenge to the court's denial of that request is barred by the doctrine of res judicata. "[A] trial court lacks jurisdiction to retroactively modify a pendente lite support order to any date earlier than the date on which a proper pleading seeking modification of such order is

15

filed, unless it specifically reserves jurisdiction to do so." (*In re Marriage of Williamson*, *supra*, 226 Cal.App.4th at pp. 1317–1318; *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 631, 638–639 (*Gruen*); *In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059, 1074–1075 (*Freitas*).) "A temporary support order is operative from the time of pronouncement, and it is directly appealable." (*Gruen*, at p. 637.) " 'If an order is appealable, . . . and no timely appeal is taken therefrom, the issues determined by the order are res judicata.' " (*Id*. at p. 638.)

In its October 9, 2020 order, the court did not expressly reserve jurisdiction to amend the temporary support award based on further consideration of evidence, nor did it specify a date certain to which the matter would be continued to preserve the ongoing nature of proceeding and prevent its ruling from becoming final for appeal purposes. (Cf. *Freitas, supra,* 209 Cal.App.4th at pp. 1074–1075.) The trial court accordingly lacked jurisdiction to order retroactive temporary support. That the October 9, 2020 support order denied "without prejudice" Elba's request for retroactive temporary support did not accord the trial court jurisdiction to retroactively modify the award. (*Gruen, supra,* 191 Cal.App.4th at p. 640.) Elba did not appeal the October 9, 2020 order which then became final and not subject to challenge.

Elba also failed to follow the statutory procedure for modification of the October 9, 2020 temporary support order, which ordinarily requires a noticed motion or order to show cause. (*Gruen, supra,* 191 Cal.App.4th at p. 640; § 3603.) Even if Elba's request had been based on a pending motion or OSC for modification, section 3603 would have prohibited the trial court from modifying any amounts that accrued before the filing of the

16

motion or OSC.  Section 3603 states:  "An order made pursuant to this chapter may be modified or terminated at any time except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." (§ 3603.)

Elba fails to establish any error by the trial court in denying her request to retroactively modify the October 9, 2020 temporary support order.

## III.  Section 271 Sanctions

### A.  Applicable Law and Standard of Review

Section 271 provides:  "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys.  An award of attorney's fees and costs pursuant to this section is in the nature of a sanction."  (§ 271, subd. (a).)

We review an award of section 271 sanctions for an abuse of discretion.  (*In re Marriage of Pearson* (2018) 21 Cal.App.5th 218, 233*; In re E.M.* (2014) 228 Cal.App.4th 828, 850.)  The imposition of section 271 sanctions "will be upheld on appeal unless the reviewing court, 'considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order.' "  (*In re E.M.*, at p. 850; *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1100 [the applicable standard of review is highly deferential].)

Elba does not dispute the trial court's finding that she refused three settlement offers Edward extended on October 30,

2020, April 20, 2021, and June 8, 2021, as well as a posttrial settlement offer in November 2021 in which each party would pay his or her own fees.  The record supports the trial court's determination that these offers were very favorable to Elba.  The trial court further found that by refusing all settlement offers, Elba required the matter to be tried, causing Edward to incur $208,000 in fees preparing for and conducting the trial.

On this record, we are unable to conclude the trial court abused its discretion by imposing sanctions against Elba under section 271.

## DISPOSITION

The judgments entered on February 2, 2022, and May 23, 2022, are affirmed.  Edward Prunchunas shall recover his costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.


18